**HONEYWELL INTERNATIONAL, INC., Appellant,**

v.

**INTERNATIONAL TRADE COMMISSION, Appellee,**

and

**Hyosung Corporation and Hyosung (America), Inc., Intervenors.**

**Nos. 02–1393, 02–1448.**

United States Court of Appeals, Federal Circuit.

Aug. 26, 2003.

Rehearing and Rehearing En Banc Denied Oct. 23, 2003.

Richard G. Taranto, Farr & Taranto, of Washington, DC, argued for appellant. Of counsel on the brief were Raphael V. Lupo and Steven A. Maddox, McDermott, Will & Emery, of Washington, DC.

Jean H. Jackson, Attorney, Office of the General Counsel, U.S. International Trade Commission, of Washington, DC, argued for appellee. With her on the brief were Lyn M. Schlitt, General Counsel; and Andrea C. Casson, Acting Deputy General Counsel. Of counsel was James M. Lyons, Attorney, U.S. International Trade Commission.

Victor N. Balancia, Pennie & Edmonds LLP, of Washington, DC, argued for intervenors. With him on the brief was Carl P. Bretscher. Of counsel on the brief were Steven I. Wallach and John C. Martin, Pennie & Edmonds LLP, of New York, New York. Of counsel were Marcia H. Sundeen, Paul Zegger, and Eric J. Fues, Pennie & Edmonds LLP, of Washington, DC.

Before LOURIE, GAJARSA, and LINN, Circuit Judges.

LINN, Circuit Judge.

Honeywell International Corporation ("Honeywell") appeals from the final determination of the United States International Trade Commission ("Commission") in Investigation No. 337–TA–457, which held that Hyosung Corporation of Seoul, Korea, and Hyosung (America), Incorporated (collectively "Hyosung") did not violate section 337 of the Tariff Act of 1930. *In re Certain Polyethylene Terephthalate Yarn and Products Containing Same,* USITC Investigation No. 337–TA–457, 2002 ITC LEXIS 665 (June 18, 2002) (*"Commission Opinion"*). The Commission specifically held that Honeywell's U.S. Patent No. 5,630,976 ("the '976 patent") was invalid as indefinite under 35 U.S.C. § 112, ¶ 2 and that certain polyethylene terephthalate yarns imported by Hyosung did not infringe the asserted claims of the '976 patent. Because the '976 patent claims are insolubly ambiguous, the Commission correctly concluded that the claims were invalid as indefinite. Accordingly, we affirm.

## BACKGROUND

### I

The '976 patent discloses a process for production of a particular multifilament polyester product called polyethylene terephthalate ("PET") yarn. In a preferred embodiment, PET yarn is converted to cord and used as textile reinforcement for automobile tires. '976 patent, col. 2, ll. 37–41. As described in the patent's written description, it is desirable to improve certain mechanical properties of the final treated tire cord, such as its tenacity and dimensional stability. *Id.* at col. 1, ll. 29–33.

A treated tire cord's mechanical properties are influenced by the production process of the PET yarn. These properties depend both on the material's molecular attributes, such as molecular size and weight, and on the material's morphology, which describes the arrangement of the masses of molecules into crystalline regions. *See generally* 14 *McGraw–Hill Encyclopedia of Science & Technology* 164, 166–68 (9th ed.2002). A material's morphology depends upon the conditions under which it was formed. *Id.* at 166. Certain treatments, such as rapid cooling in liquid nitrogen, inhibit the formation of crystalline regions and produce an amorphous material. '976 patent, col. 5, ll. 6–8.

According to the written description, previous PET yarn production processes either produced yarn of poor mechanical quality or required difficult production steps. *Id.* at col. 1, ll. 39–42, 49–51. The '976 patent discloses a production process for PET yarn resulting in a treated tire cord with the desired mechanical properties of high tenacity in combination with improved dimensional stability. *Id.* at col. 2, ll. 2–4. PET yarn is produced "by spinning under high stress conditions in the transition region between oriented-amorphous and oriented-crystalline undrawn yarns." *Id.* at col. 1, ll. 54–67. This spun yarn is then stretched under heat to produce drawn yarn. *Id.* At each stage, the temperature and physical manipulation of the material are carefully controlled to achieve a specific morphology. *See id.* The drawn yarn is twisted and plied into cord and then treated with chemicals. *Id.* at col. 1, l. 67—col. 2, l. 2.

The '976 patent has seventeen claims covering a process for PET production. In general, the patent claims describe the mechanical properties of the spun and drawn PET yarn during different stages of the production process. Claims 1, 7, and 14 are independent claims. Claims 1 and 14 are representative and provide:

1. A process for production of a drawn polyethylene terephthalate yarn which translates to a high tenacity dimensionally stable tire cord, comprising:

(A) extruding a molten melt-spinnable polyethylene terephthalate having an intrinsic viscosity of 0.8 or greater through a shaped extrusion orifice having a plurality of openings to form a molten spun yarn,

(B) solidifying the spun yarn gradually by passing the yarn through a solidification zone which comprises (a) a retarded cooling zone and (b) a cooling zone adjacent said retarded cooling zone wherein said yarn is rapidly cooled and solidified in a blown air atmosphere,

(C) withdrawing the solidified yarn at sufficient speed to form a crystalline, partially oriented yarn with a crystallinity of 3 to 13% and a melting point elevation of 2 to 10 C., and

(D) hot drawing the yarn to a total draw ratio between 1.5/1 and 2.5/1.

14. A process for the production of a drawn polyethylene terephthalate yarn which translates to a high tenacity dimensionally stable tire cord comprising:

(a) extruding a molten melt-spinnable polyethylene terephthalate having an intrinsic viscosity of 0.8 or greater through a shaped extrusion orifice having a plurality of openings to form a molten spun yarn;

(b) solidifying the spun yarn gradually by passing the yarn through a solidification zone which comprises (i) a retarded cooling zone and (ii) a cooling zone adjacent said retarded cooling zone wherein said yarn is rapidly cooled and solidified in a gaseous atmosphere;

(c) withdrawing the solidified yarn at sufficient speed to form a crystalline partially oriented yarn with a crystallinity of 7 to 13%; and

(d) hot drawing the yarn to a total draw ratio between 1.5/1 and 2.5/1;

thereby obtaining a drawn yarn with a terminal modulus of at least 20 g/d and a melting point elevation of 10 C. to 14 C. *Id.* at col. 13, ll. 31–49, col. 14, ll. 38–58. Claim 7 is identical to claim 1 except for a larger claimed range of crystallinity and the addition of a limitation for "obtaining a drawn yarn with a terminal modulus of at least 20 g/d." *Id.* at col. 13, l. 58—col. 14, l. 9.

The claims require that, as the material goes through different steps in the production process, the material exhibits mechanical properties within a claimed range before proceeding from one step to the next. For example, when producing PET yarn using the process in claim 1, an operator extrudes a polymer with an intrinsic viscosity of 0.8 or greater and then adjusts certain processing conditions to achieve a crystallinity of 3 to 13% and a melting point elevation of 2 to 10 C. The adjustable processing conditions include: the length and temperature of an annealing zone adjacent to a spinnerette, the diameter of the spinnerette holes, the method of blowing the quench, the quench air velocity, and the drawdown in the quench column. *Id.* at col. 7, ll. 25–29. Once the claimed crystallinity and melting point elevation are measured and achieved, the yarn is hot drawn to a specified draw ratio.

The dispute in this case focuses on the method of measuring one claimed feature—the melting point elevation ("MPE"). All claims require that the yarn produced by the claimed process fall within a specified MPE range at some point during the process. The '976 patent defines MPE as "the difference between the specimen melting point (M.P.) and the melting point (M.P.Q.) of a specimen after subsequent rapid liquid nitrogen quenching of an encapsulated [differential scanning calorimeter] sample from the melt." *Id.* at col. 5, ll. 2–6. The written description recites one

example of how to measure the MPE, including a sample size, the rate of temperature increase for performing the test, and the equipment to be used:

> Melting points (M.P.) were determined with a Perkin–Elmer Differential Scanning Calorimeter (DSC) from the maxima of the endotherm resulting from scanning a 2 mg sample at 20 C. per minute.... M.P. is taken to be the temperature of the highest temperature peak of the DSC trace.

*Id.* at col. 4, l. 64—col. 5, l. 2. Notably, the written description does not disclose any method that must be used to prepare the PET yarn specimen for thermal analysis in the DSC.

The sample PET yarn specimen can be produced in a number of different ways. Three sample preparation methods were published in the art as of the earliest priority date of the '976 patent. Those methods include: (1) the "coil method;" (2) the "cut method;" and (3) the "restrained method." *See generally* M. Jaffe, *Fibers*, in 7 *Thermal Characterization of Polymeric Materials* 709–92 (Edith A. Turi ed., 1981). A fourth method of sample preparation, the "ball method," was known to those of skill in the art at the time of the invention, but was not published. The only written description of the ball method in the record is a confidential Honeywell document.

As each name suggests, the four sample preparation methods refer to the manner in which the yarn is gathered for testing. An operator measuring the MPE using the "coil method" grasps a yarn sample using a pair of tweezers and coils the yarn around the tips of the tweezers. The tweezers are then withdrawn from the sample as the resulting coil is deposited in the DSC pan for testing. *See Order No. 61: Initial Determination Granting in Part and Denying in Part Respondents' Motion for Summary Determination of Non–Infringement and Invalidity of U.S. Patent No. 5,630,976*, slip op. at 42 (USITC Feb. 4, 2002) ("*Initial Determination*"). Using the "cut method," a yarn sample is cut into tiny snippets with a razor blade or scalpel and then placed into the DSC pan before placing a lid on the pan. *Id.* Under the "restrained method," the ends of a yarn specimen are physically restrained during the heating to keep the sample length constant. *See* Jaffe, *supra*, at 721–22. Finally, when using Honeywell's "ball method," the operator grasps a yarn sample of a specified size using a pair of tweezers in one hand. The operator then twists it between the fingers of the other hand to start rolling the sample into a ball. The sample is then released from the tweezers, rolled completely into a ball, weighed, and then placed into a sample pan for testing. *Initial Determination*, slip op. at 41–42.

Depending upon which sample preparation is used, the calculated MPE for a given sample can vary greatly. Specifically, the administrative law judge found that "[t]he ball method is the only sample preparation technique that has been shown to result in MPEs for the accused PET yarn products that fall within the claimed ranges and levels." *See id.* at 5. Using the cut method, the MPEs of the accused product fall outside the claimed ranges and levels. *Id.* No one challenges those findings on appeal.

II

On May 17, 2001, the Commission instituted a patent-based investigation concerning the importation and sale of PET yarn and PET yarn-containing products. In this proceeding, Honeywell complained that Hyosung was importing PET yarn and PET yarn-containing products produced by a process that infringed claims 1–2, 4–5, 7–8, 10–11, and 13–17 of the '976

patent in violation of section 337 of the Tariff Act of 1930. After the complaint was referred to an administrative law judge for an evidentiary hearing, Hyosung, supported by the Commission investigative attorney, moved for summary determination of non-infringement and invalidity of the '976 patent. Honeywell and Hyosung disputed, among other things, whether construction of the claims required the use of a particular sample preparation method. Honeywell argued that the claims must be construed to require measurement of the MPE using the ball method and not using the cut method, coil method, or restraining method. Hyosung did not offer a competing construction other than to argue that the claims should not be construed to specifically require the ball method.

On February 4, 2002, the presiding administrative law judge issued the *Initial Determination*, a portion of which granted Hyosung's motion for summary determination of no infringement, and a portion of which denied Hyosung's motion as to patent invalidity. With respect to the claim construction issue, the administrative law judge held that "the term 'melting point elevation' in the asserted claims of the '976 patent should be construed ... to permit the measurement of melting points by means of any sample preparation method known to persons of ordinary skill in the art as of the earliest priority filing date of the '976 patent, which would include the cut method used by Hyosung." *Id.* at 26–27. Despite that broad construction, the administrative law judge then found that Hyosung did not infringe the asserted claims. *Id.* at 42. Furthermore, the administrative law judge held that Hyosung failed to prove by clear and convincing evidence that the claims at issue were invalid under 35 U.S.C. § 112, ¶¶ 1 and 2, due to indefiniteness, lack of enablement, or failure to provide an adequate written description. *Id.* Subsequently, Honeywell sought review from the Commission of the claim construction and the determination of non-infringement. Likewise, Hyosung and the Commission investigative attorney appealed the portion of the determination denying summary determination of invalidity.

On March 21, 2002, the Commission declined to review the administrative law judge's determination of non-infringement. As such, the administrative law judge's initial determination became the final determination of the Commission. *See* 19 C.F.R. § 210.42(h) (2001). However, the Commission accepted the appeal of the denial of summary determination of invalidity, limiting its inquiry solely to the issue of indefiniteness under 35 U.S.C. § 112, ¶ 2.

On appeal, the Commission reversed the administrative law judge's determination that Hyosung failed to prove by clear and convincing evidence that the claims were indefinite. *Commission Opinion,* slip. op. at 19. The Commission reasoned that "the published art of thermal analysis recognizes that the manner in which a PET yarn sample is prepared for testing affects the value of the melting point measurement obtained, and demonstrates that the practice in the art is to state which method of sample preparation is used." *Id.* at 16. Because the '976 patent's written description failed to disclose any particular method for PET yarn sample preparation, the Commission found "that the claims in issue are not 'as precise as the subject matter permits,' particularly in view of the published literature in the field at the time of the filing of the '976 patent." *Id.* Thus, the Commission found those terms ambiguous and held that the claims were indefinite under 35 U.S.C. § 112, ¶ 2.

In these consolidated appeals, Honeywell challenges the finding of non-infringement, arguing that the final determination rests upon a faulty claim construction.

Honeywell also appeals the determination that the '976 patent is invalid. Hyosung filed a brief as intervenors. This court has jurisdiction pursuant to 28 U.S.C. § 1295(a)(6).

### DISCUSSION

#### A. Standard of Review

 In appeals from the Commission under 28 U.S.C. § 1295(a)(6), the issue before this court is whether the Commission erred when determining whether a violation of section 337 of the Tariff Act of 1930 occurred. *See* 19 U.S.C. § 1337 (2000). We review the Commission's factual findings in accordance with the Administrative Procedure Act. *See Id.* § 1337(c). Such findings will be sustained unless they are unsupported by substantial evidence. *See* 5 U.S.C. § 706(2)(E) (2000); *Jazz Photo Corp. v. Int'l Trade Comm'n,* 264 F.3d 1094, 1099 (Fed.Cir.2001). "Substantial evidence" has been defined as "more than a mere scintilla" and as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consol. Edison Co. v. NLRB,* 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938). We review the Commission's legal determinations de novo. *See* 5 U.S.C. § 706(2)(A) (2000); *Finnigan Corp. v. Int'l Trade Comm'n,* 180 F.3d 1354, 1361–62 (Fed.Cir.1999). Claim construction is a legal determination that is reviewed de novo. *Markman v. Westview Instruments, Inc.,* 52 F.3d 967, 979 (Fed. Cir.1995) *(en banc), aff'd,* 517 U.S. 370, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996). Likewise, a determination of whether a claim recites the subject matter which that applicant regards as his invention and is sufficiently definite, so as to satisfy the requirements of 35 U.S.C. § 112, ¶ 2, is a legal conclusion that is reviewed de novo. *Solomon v. Kimberly–Clark Corp.,* 216 F.3d 1372, 1377 (Fed.Cir.2000).

#### B. Claim Construction & Definiteness

 "In construing claims, the analytical focus must begin and remain centered on the language of the claims themselves, for it is that language that the patentee chose to use to 'particularly point[ ] out and distinctly claim[ ] the subject matter which the patentee regards as his invention.'" *Interactive Gift Express, Inc. v. Compuserve, Inc.,* 256 F.3d 1323, 1331 (Fed.Cir.2001) (quoting 35 U.S.C. § 112, ¶ 2); *see generally Tex. Digital Sys., Inc. v. Telegenix Inc.,* 308 F.3d 1193, 1201–02 (Fed.Cir.2002). The terms used in the claims bear a presumption that they mean what they say and have the ordinary meaning that would be attributed to those words by persons skilled in the relevant art. *See CCS Fitness, Inc. v. Brunswick Corp.,* 288 F.3d 1359, 1366 (Fed.Cir.2002). Moreover, unless compelled otherwise, a court will give a claim term the full range of its ordinary meaning as understood by persons skilled in the relevant art. *See Rexnord Corp. v. Laitram Corp.,* 274 F.3d 1336, 1342 (Fed.Cir.2001).

 If the court determines that a claim is not "amenable to construction," then the claim is invalid as indefinite under 35 U.S.C. § 112, ¶ 2. *Exxon Research & Eng'g Co. v. United States,* 265 F.3d 1371, 1375 (Fed.Cir.2001). The definiteness requirement of § 112, ¶ 2 "focuses on whether the claims, as interpreted in view of the written description, adequately perform their function of notifying the public of the [scope of the] patentee's right to exclude." *S3 Inc. v. nVIDIA Corp.,* 259 F.3d 1364, 1371–72 (Fed.Cir.2001) (citing *Solomon,* 216 F.3d at 1379). It requires "that the claims be amenable to construction, however difficult that task may be." *Exxon Research,* 265 F.3d at 1375. Because a claim is presumed valid, a claim is indefinite only if the "claim is insolubly ambigu-

ous, and no narrowing construction can properly be adopted." *Id.*

Honeywell attacks both the finding of non-infringement and the finding of invalidity. Honeywell first argues that the Commission misconstrued the claim language; and that under a correct construction, summary determination of non-infringement was inappropriate. Honeywell then argues that after conducting a "narrowing, validity-saving [claim construction] choice" the claims are definite and the Commission erroneously concluded otherwise.

The claim construction dispute focuses on the claim term "melting point elevation" or MPE. Claims 1 and 7 require that after solidifying the spun yarn by passing it through a solidification zone, but before hot drawing the yarn to a specified total draw ratio, the solidified yarn must be withdrawn at a sufficient speed to form a crystalline, partially oriented yarn with a specified crystallinity and a specified MPE. Claim 14 requires that the yarn exhibit an MPE within a specified range after hot drawing the yarn. The claim construction dispute specifically focuses on whether the claims require any particular sample preparation method when determining the MPE.

The written description expressly defines MPE as "the difference between the specimen melting point (M.P.) and the melting point (M.P.Q.) of a specimen after subsequent rapid liquid nitrogen quenching of an encapsulated [differential scanning calorimeter] sample from the melt." '976 patent, col. 5, ll. 2–6. However, neither the claims, the written description, nor the prosecution history reference any of the four sample preparation methods that can be used to measure the MPE. The Commission's final determination includes a finding of fact that the choice of sample preparation method is critical to discerning whether a particular product is made by a process that infringes the '976 patent claims. *Commission Opinion,* slip op. at 12. Honeywell does not challenge that finding on appeal.

Without any reference to a sample preparation method, there are at least two possible constructions of the term—the "any one method" construction and the "all methods" construction. Honeywell suggests a third construction—that the MPE must be determined using the unpublished "ball method." Under the "any one method" construction, the claims would be satisfied if, during the relevant step in the production process, the melting point elevation fell within the claimed range using any one of the four known sample-preparation techniques. Thus, regardless which method the operator chooses—the cut, coil, restrained, or ball methods—the claim would be satisfied so long as any one sample preparation method produced the claimed measurement. Under the "all methods" construction, the claims would be satisfied only if, during the relevant step in the production process, the MPE fell within the claimed range using each of the four known sample-preparation techniques. Thus, producing a yarn according to the claims would require that, during the relevant production step, the MPE fell within the claimed range using the cut, coil, restrained, and ball methods. Under the "ball method" construction, the claims would be satisfied if the MPE fell within the claimed ranges using the ball method regardless of whether the claims are satisfied using any of the three other known methods.

The intrinsic record does not compel a narrowing of the claim language to any one of the possible definitions. The claims, written description, and prosecution history do not mention the different sample preparation methods or provide sufficient clues to discern which methods are acceptable. The written description

does mention the use of a Perkin–Elmer DSC and 2 mg specimen sample size, but that information does not lead one of ordinary skill in the art to a particular sample preparation method. For example, the cut method, coil method, and ball methods could each be performed in a Perkin–Elmer DSC with a 2 mg specimen sample size. Because the intrinsic record is devoid of meaningful references to those processes, the intrinsic record fails to "resolve any ambiguity in a disputed claim term." *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1583 (Fed.Cir.1996).

Honeywell's only support for its claim construction comes from the declaration testimony of its expert, Dr. Weigmann. Weigmann testified that one of ordinary skill in the art would conclude from the written description and the claims that the inventors contemplated the ball method as the only method of measuring the MPE. He criticized each of the three other tests. With respect to the coil method, Weigmann stated that it was "not practical" because it would be difficult to make a 2 mg specimen sample long enough to coil around the tips of tweezers. He criticized the cut method as "less reproducible" and "less practical" because the yarn sample shrinks, causing alterations to the structure of the fiber and leading to inaccurate results. Weigmann further testified that while the restraining method was the most reproducible, one of skill in the art would not understand the term "melting point elevation" to refer to that method because it was not possible at the time of the application to use the restraining method with the conventional DSC equipment mentioned in the written description.

The Commission points to extrinsic evidence to support its argument that one of skill in the art would not exclude the three published sample preparation methods in favor of the unpublished ball method. One prior art article of record describes preparing 1 to 2 mg PET yarn samples with two different "methods of sample placement," the cut method and the restrained method. *See* Arata Miyagi & Bernhard Wunderlich, *Superheating and Reorganization of Melting of Poly(ethylene Terephthalate)*, 10 J. Polymer Sci.: Polymer Physics Ed. 1401, 1402 (1972). While that article refers to different measuring equipment than that specified in the '976 patent, the article supports the proposition that those skilled in the art used the cut and restrained methods at the time of the application of the '976 patent. The Commission also pointed to the *Japanese Industrial Standard, Testing Methods for Transition Temperatures of Plastics K 7121* (1987), which outlined a sample preparation method for DSC testing using the cut method. Both Hyosung and the Commission note the absence in the record of any published documentation of the ball method outside of Honeywell's confidential files.

■ After reviewing the entire record regarding claim construction, we agree with the Commission and hold that the claims are insolubly ambiguous, and hence indefinite, with respect to a required sample preparation method. As we discuss below with respect to each proffered construction, the claims, the written description, and the prosecution history fail to give us, as the interpreter of the claim term, any guidance as to what one of ordinary skill in the art would interpret the claim to require. Moreover, because the sample preparation method is critical to discerning whether a PET yarn has been produced by the claimed process, knowing the proper sample preparation method is necessary to practice the invention.

1. The "Ball Method Only" Construction

Honeywell urges us to adopt the "ball method only" construction because that

construction is the "validity saving choice." However, even if, as Weigmann suggests, the ball method were "more practical" than other methods, the intrinsic evidence cannot be construed to eliminate all other known methods of sample preparation. Honeywell's proffered construction is only supported by its expert's declaration. The cut method, coil method, and restraining method are well documented in technical publications and the prior art. The ball method, while perhaps known to some in the art, is only documented in proprietary Honeywell documents. Adopting Honeywell's proffered construction would require the court to import a limitation that is not only outside the bounds of the claims, the written description, and the prosecution history, but is also outside the scope of any written publication. We may not rewrite claims to preserve validity in that manner. *Rhine v. Casio, Inc.*, 183 F.3d 1342, 1345 (Fed.Cir.1999); *Quantum Corp. v. Rodime, PLC*, 65 F.3d 1577, 1584 (Fed.Cir. 1995) ("Although we construe claims, if possible, so as to sustain their validity, it is well settled that ... courts do not redraft claims." (citations omitted)).

### 2. The "Any One Method" Construction

Just as we cannot limit the term MPE to the "ball method only" construction, we cannot limit the construction of MPE to the "any one method" construction. Because the sample preparation method is critical in determining MPE, processes utilizing different sample preparation methods will produce different yarns. Without knowing which sample preparation method to use, one cannot discern whether a yarn was produced using the claimed process. Under the "any one method" construction, the testing results will necessarily fall within or outside the claim scope depending on the sample preparation method chosen. Competitors trying to practice the invention or to design around it would be

unable to discern the bounds of the invention. *See Morton Int'l v. Cardinal Chem. Co.*, 5 F.3d 1464, 1470 (Fed.Cir.1993) (holding claims indefinite because one skilled in the art could not determine whether a given compound was within the scope of the claims).

The criticality of sample preparation method also distinguishes this case from *PPG Industries, Inc. v. Guardian Industries Corp.*, 75 F.3d 1558 (Fed.Cir.1996). In that case, PPG accused Guardian of infringing its patent directed to a glass composition consisting of different ingredients and exhibiting an ultraviolet transmittance within a certain range. *PPG Indus.*, 75 F.3d at 1560–61. Guardian argued that the claims were indefinite because the written description failed to state the method the inventors used to measure the ultraviolet transmission of the invention. This court rejected that argument because "all of the conventional methods of testing ultraviolet transmittance produce essentially identical results." *Id.* at 1563. As such, the claims were "sufficiently definite to put the public on fair notice of what compositions fall within the scope of the claims." *Id.* Here, the different sample preparation methods do not produce identical or even "essentially identical results."

### 3. The "All Methods Construction"

With respect to the final possible claim construction, the "all method" construction, Honeywell admits that such a construction would render the invention inoperable. While an inoperable claim construction would render the claim invalid for lack of enablement rather than for indefiniteness, *see EMI Group N. Am., Inc. v. Cypress Semiconductor Corp.*, 268 F.3d 1342, 1348 (Fed.Cir. 2001), the claim is nevertheless invalid. Because the '976 patent claims are either indefinite or not enabled, the Commission correctly determined that Hyo-

sung did not violate section 337 of the Tariff Act of 1930 by importing into the United States articles that "are made, produced, processed, or mined under, or by means of, a process covered by the claims of a *valid and enforceable* United States patent." 19 U.S.C. § 1337(a)(B)(ii) (2000) (emphasis added).

## C. Infringement

██ Despite its holding that the claims were invalid, the Commission let stand the administrative law judge's finding that the claims were not infringed. A determination of infringement requires a two-step analysis. "First, the court determines the scope and meaning of the patent claims asserted ... [and secondly,] the properly construed claims are compared to the allegedly infringing device." *Cybor Corp. v. FAS Techs., Inc.,* 138 F.3d 1448, 1454 (Fed.Cir.1998) (*en banc*) (citations omitted). Because the claims are indefinite, the claims, by definition, cannot be construed. *Exxon Research,* 265 F.3d at 1375. Without a discernable claim construction, an infringement analysis cannot be performed. To the extent that the Commission attempted to perform an infringement analysis of indefinite claims, we vacate that finding as moot.

## CONCLUSION

All claims of the '976 patent are invalid for failure to "particularly point[ ] out and distinctly claim[ ] the subject matter which the patentee regards as his invention." 35 U.S.C. § 112, ¶ 2. The Commission correctly held that Hyosung did not violate section 337 of the Tariff Act of 1930 by infringing a valid U.S. patent. Accordingly, we affirm.

*AFFIRMED.*